25554. NOBLES v. H. W. DURHAM & COMPANY, INC. et al.

Argued January 13, 1970—Decided February 5, 1970—Rehearing denied February 19, 1970.

Richard D. Phillips, for appellant.

Pierce, Ranitz, Lee, Berry & Mahoney, John F. M. Ranitz, Jr., Howard A. McGlasson, Jr., for appellees.

NICHOLS, Justice. Certiorari was granted in this case to review the decision of the Court of Appeals holding that the evidence submitted in connection with a motion for a summary judgment demanded a finding that H. W. Durham & Company, Inc., was not a motor carrier as defined in Code Ann. Ch. 68-5. Nobles v. H. W. Durham & Co., 120 Ga. App. 418 (170 SE2d 764).

The evidence disclosed that Rayonier, Inc. would not purchase pulpwood except from designated sources, that H. W. Durham & Company, Inc. (hereinafter referred to as Durham) was one of these sources, that on some occasions Durham would contract with the landowners for permission to cut timber and with "producers" to cut and haul the pulpwood to Rayonier, that at other time the "producer" would locate timber to be cut and contract with the landowner, that normally in either event Durham would receive compensation from Rayonier for the pulpwood actually delivered and disburse the "stumpage charge" to the landowner and the "cutting and hauling charge" to the "producer," that the "producer" would then pay the laborers and truck drivers from the amount paid him by Durham, keeping the remainder as his profit and that Durham also deducted workmen's compensation and other insurance premiums from the amount paid the producers.

As to the arrangement between Durham and the co-defendant Branch the evidence disclosed that at the time of the collision out of which the action arose Branch had been cutting and hauling pulpwood to Rayonier for Durham for a period of years under an oral agreement that could have been canceled by either party without advance notice, that the particular timber being cut was located by Branch and an agreement as to the "stumpage" price worked out by him with the owner, but that Durham paid the owner the "stumpage charge" from each cord of pulpwood cut and delivered to Rayonier by Branch.

Inasmuch as the load far exceeded 18,850 pounds, the exemption contained in *Code Ann.* § 68-502 (c) (2) is not applicable regardless of the question of the title of the pulpwood at the time of the collision.

The decisions in *Malcom v. Sudderth,* 98 Ga. App. 674 (106 SE2d 367), and *Campbell v. Travelers Ins. Co.,* 100 Ga. App. 853 (112 SE2d 311), and the numerous cases there cited foreclose any question but that a finding would be authorized under the above evidence that Branch was not an independent contractor insofar as his relationship to Durham is concerned, and his obtaining a source for pulpwood would under such circumstances be an act for Durham and not for himself. This leaves the question of Durham's relationship to Rayonier and to the owner of the timber to be considered in order to determine if a summary judgment that Durham was not a motor carrier and that therefore the Superior Court of Long County lacked venue of the defendant was demanded.

Under the evidence adduced in support of the motion for summary judgment, when pulpwood was delivered to Rayonier, the driver delivered with it a card issued by Durham as authority to deliver pulpwood to Rayonier. This card showed the name of the "dealer"—Durham, the name of the "producer"—Branch, the "stumpage source"—the owner of timber cut into pulpwood, the "zone" where the timber was grown (county), as well as the type of timber from which the pulpwood was produced, the truck number and the date and authorization signature of the "dealer."

This card and the information contained thereon would not be conclusive as to title to the pulpwood being hauled, and there was no other evidence to show whether title to the pulpwood was in the owner of land until delivered to Rayonier or whether title was earlier transferred to Durham. Accordingly, the evidence submitted in support of the motion for summary judgment did not eliminate from issue the question of whether Durham was engaged in "controlling, operating or managing any motor propelled vehicle used in the business of transporting . . . property for hire over any public highway in this State . . ." and the fact that Durham may have provided labor to cut such

timber into pulpwood as well as provided for the hauling of such pulpwood for the owner would not have the effect of removing the hauling activities from the provisions of *Code Ann. Ch.* 68-5, which language is definitely broader in defining motor carriers than various definitions used by textwriters generally in dealing with private carriers for hire.

The Court of Appeals erred in affirming the grant of the summary judgment by the trial court.

*Judgment reversed. All the Justices concur. Felton, J., concurs specially.*

FELTON, Justice, concurring specially. The question to be decided is whether under applicable principles of law H. W. Durham & Company, Inc., was a contract carrier under Ga. L. 1931, Ex. Sess., pp. 99, 107, as amended, Ga. L. 1965, p. 257 (*Code Ann.* § 68-514) and, if so, whether it could transfer its obligations and responsibilities to an unlicensed, alleged independent contractor who contracted to produce and transport pulpwood to the ultimate purchaser of the pulpwood, the purchase, production and transportation of which was to be governed by the contract between Rayonier, Inc., a pulpwood manufacturer, and H. W. Durham & Company, Inc. If Durham was a contract carrier the action was properly filed against it in Long County, where the deaths occurred. *Code Ann.* § 68-514 (b). Durham was engaged by Rayonier to furnish it with pulpwood in a prescribed territory in which the transactions involved in this case took place. The arrangement between Durham and Rayonier involved several kinds of transactions: (1) The sale and transportation of pulpwood which Durham owned and sold and transported to Rayonier; (2) the purchase of pulpwood by Durham, as broker or dealer, for Rayonier—in which cases Durham undertook to obtain leases on the pulpwood from the owners and to provide for the cutting of the wood and transportation to the mill of Rayonier; and (3) cases where a producer and transporter bought or engaged to buy pulpwood from an owner who sold to the producer other than one having a connection with Rayonier. In this last class of transactions the producer and transporter could not sell, produce and deliver pulpwood to Rayonier, in the territory stipulated, without turn-

ing the complete operation over to Durham as Rayonier's dealer except that sometimes in such cases Rayonier issued a check in payment of the price of the pulpwood to the owner rather than pay Durham the full price of all items involved, cost, production and transportation, and let Durham issue checks to the owner and seller of the wood, the producer and transporter, and retain its own charges for its brokerage. The first of the methods of handling by Durham is irrelevant to this case as it involves issues not present in this case. A discussion of the second method employed is relevant because it throws light on the method employed by the parties in this case and the legal consequences of the intention of the parties. In the second method of handling, Durham, as dealer or broker for Rayonier, undertakes to purchase the pulpwood from the owner. While the title to the pulpwood bought for Rayonier might be in the dealer temporarily, it went to Rayonier upon payment to the owner and delivery to Rayonier at its mill. The dealer could not sell to others the pulpwood bought for Rayonier as dealer, so, in effect, the total contract between Rayonier and the dealer, Durham, was that the dealer's undertaking was to buy, produce and deliver to Rayonier the wood purchased for Rayonier, the purchase being often financed by Rayonier. In our view, this kind of agreement involved the agreement by the dealer to transport the wood to Rayonier, as the total price paid by Rayonier included the cost of transportation. This is clearly an agreement to transport another's property for hire as a contract carrier under the plain terms of Georgia law. Ga. L. 1931, Ex. Sess., pp. 99, 100, as amended, Ga. L. 1964, p. 298 (*Code Ann.* § 68-502 (c)). It does not comport with logic and common sense to say that the dealer could escape his responsibility under the law by contending that he was hauling his own property as a private carrier. The fixing of the title to property transported at the moment of transportation is not always the criterion for the conclusion that one who hauls property when the title thereto is in the carrier is a private carrier. If this were the case, this would be about the largest opportunity for law evasion that could be imagined. As we have stated, we have argued this second

arrangement to see what is the truth about this case where the producer-hauler bought, or arranged for the purchase of, the pulpwood from the owner and purchase price of which was paid directly from Rayonier to the owner and where payment for the other items, production and transportation, was made to the dealer, who distributed it to the producer and hauler to cover expenses of production and transportation. If Durham had stayed out of this transaction, W. H. Branch,—the producer who procured the title to the pulpwood in this case, under what we have argued above—would not be a carrier for hire if he hauled the pulpwood, because it was his and ultimately and quickly to become the property of Rayonier and he had no contract with Rayonier to transport. But Durham did not stay out of the picture, because Rayonier promised it that Rayonier would not deal for pulpwood in that territory unless it was at least produced and transported by the dealer. (Rayonier evidently knew that W. H. Branch, the transporter and producer, had acquired title to the pulpwood here involved from the owner because Branch tried to sell it to Rayonier.) In these circumstances, the intention of the parties was that Durham was to do everything usually done when it procured wood and produced and hauled it except procure the title from the owner, because Rayonier insisted that its dealer perform all the other essentials of the contract or it would not purchase the pulpwood which W. H. Branch had bought. In view of the arrangement between Rayonier and the dealer, W. H. Branch was forced to quit acting on his own and procure and transport for Durham. As stated before, Durham made a contract to haul for hire. It could do so only through regular agents of the corporation or agents hired specially by the corporation. The only ways in which Durham legally could have carried out its contract would have been (1) to get a certificate of convenience and necessity from the Georgia Public Service Commission, or (2) to have the wood transported by a certified contract or common carrier. Otherwise, Durham was a carrier for hire and W. H. Branch and Arthur Branch were its agents. The fact that neither Branch nor Durham had certificates proves nothing. There was no evidence that any were applied for and refused, and the reason for refusal.

The fact that a hauler has title to property he hauls is not conclusive that he is a private carrier. *Southeast Shippers Assn. v. Ga. Public Service Commission,* 211 Ga. 550 (87 SE2d 75) and cit.; A. W. Stickle & Co. v. Interstate Commerce Commission, 128 F2d 155; Scott v. Interstate Commerce Commission, 213 F2d 300, 301. The facts in Elkins v. Schaaf, 189 Wash. 42 (63 P2d 421), clearly distinguish it from this case. The case of *Newsome v. Dunn,* 103 Ga. App. 656, 658 (120 SE2d 205), holding that a shipper does not have to inquire of a certified carrier the extent of his authorized operations, is not relevant to the facts in this case. In that case, the hauler had a certificate as a carrier for hire. In the circumstances of this case, Durham could not evade its responsibility under its contract with Rayonier by farming out to a producer an *uncertified* hauler as a so-called independent contractor. To permit it, would rob citizens of the protection the law provides for them through regulation—protection both for the parties as well as the public, for the good and safety of all.

I concur in the judgment for the above reasons.