**SECOND DIVISION**
**RICKMAN, P. J.,**
**GOBEIL and DAVIS, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**October 27, 2025**

# In the Court of Appeals of Georgia

A25A1015. BALL v. CSX INTERMODAL TERMINALS, INC. et al.

DAVIS, Judge.

In this unfortunate personal injury action, Tyrik Ball appeals from the trial court's order granting summary judgment to CSX Intermodal Terminals, Inc. and U. S. Services, LLC (collectively "the Defendants"). On appeal, Ball argues that (1) genuine issues of material fact remain on his negligence claims; and (2) the trial court erred by striking portions of his expert witness' affidavit on the grounds that the issues raised therein were not beyond the understanding of the average juror. After a careful review of the record, we affirm.

Summary judgments enjoy no presumption of correctness on appeal, and an appellate court must satisfy itself de novo that the requirements of OCGA § 9-11-56 (c) have been met. In our de novo review of the grant

of a motion for summary judgment, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the nonmovant.

(Citation omitted.) *Chandler v. City of Lafayette*, 370 Ga. App. 46 (894 SE2d 65) (2023).

So viewed, the record shows that U. S. Services, LLC ("USS"), is a company that transports shipping containers. CSX stores shipping containers for drivers to pick up and deliver to vendors, and it operates facilities in Fairburn and Austell, Georgia. CSX's Fairburn facility uses a lift procedure in which a driver or "drayman"[1] positions their tractor-trailer and chassis in a designated area, and a manually or electronically operated crane loads the container onto the chassis. The driver or drayman is responsible for opening the "twist locks" before the container is loaded onto the chassis and then, after the container is loaded onto the chassis, ensuring that the container is secured by closing the twist locks. If the twist locks are closed during the loading process, the container will not sit properly on the chassis. If a driver has

---

[1] "Draymen" "is a technical term that is used to describe drivers who pick up freight in the yard."

difficulty closing a twist lock, a hammer is used to hit the twist lock into a locked position to secure the container to the chassis.

In 2021, Ball was employed as an intermodal truck driver under a lease agreement between USS and his employer, Winston & Son Trucking, LLC. On January 7, 2021, USS dispatched Ball to CSX's Fairburn facility, which he had worked at "over 100 times," to retrieve a 43,000-pound shipping container. After Ball arrived at the facility, he retrieved a chassis, inspected it to make sure it was in working condition, inspected the twist locks to ensure they opened and closed properly, connected the chassis to his trailer, and went to the loading area for the container to be loaded onto the chassis. While waiting for the container to be loaded, Ball again inspected the chassis to ensure it functioned properly. At the time of the incident, the crane was operated by John McArthur. According to the video footage of the accident, after McArthur loaded the container onto the chassis, a noticeable gap on the right passenger rear-side of the trailer appeared, which was most apparent when another truck passed horizontally in front of the truck. Ball, however, stated that he did not observe a gap between the container and the chassis.[2] According to Ball, although the

---

[2] Ball ultimately agreed that still photos from the video footage showed a gap between the container and the chassis.

container was initially seated properly on the chassis, the crane apparently malfunctioned, and the container no longer sat properly on the chassis. He also believed that McArthur did not properly load the container onto the chassis.

Ball then began to secure the container onto the chassis. He walked to the right side of the rear of the trailer and used a hammer to close a twist lock so that the container would sit properly onto the chassis. While attempting to close the twist lock with the hammer, Ball placed his left hand in the gap between the container and the chassis. The container then dropped onto his hand and crushed two of his fingers, which were later amputated. Ball stated that he did not realize that he had placed his hand in the gap and admitted that it was not reasonable for someone to put their hand in the gap.

Ball filed suit against the Defendants and John Does 1-10, asserting claims for negligence, product liability, negligent training, intentional destruction and fraudulent concealment of crucial records, and falsification of records.[3] CSX filed a motion for

---

[3] During the litigation, Ball's counsel and CSX's counsel got into a dispute about whether the crane operator manual was filed under seal pursuant to a court order, which led to Ball's counsel filing suit against CSX's counsel for libel. The trial court granted CSX's counsel motion to dismiss the complaint under the anti-SLAPP statute, and we affirmed that ruling on appeal. See *Potts v. Richardson*, 376 Ga. App. 90 (918 SE2d 146) (2025).

summary judgment on Ball's negligence and products liability claims, arguing that Ball's actions were the proximate cause of his injuries, Ball could have avoided his injuries, and it did not design or manufacture the chassis, container, twist lock, or crane. USS also moved for summary judgment, arguing that it had no role in loading the container onto the chassis, Ball's actions were the sole proximate cause of his injuries, Ball could have avoided his injuries, and that it did not design the equipment involved in the accident. Ball opposed the motions and submitted an affidavit from Carl Berkowitz, PhD. in which he averred in part:

47. "[I]t is my opinion that all four [twist locks] were open at the time that Mr. McArthur landed the container onto the chassis immediately before Mr. Ball lost his fingers.

48. The basis for this opinion that the 4 [twist locks] were open position in is [sic] addition to Mr. Ball's testimony, it is standard operating procedure not to lower the container unless the remote crane operator is assured that all [twist locks] are in the open position.

49. [CSX] failed to follow the [crane operating manual] as well as generally accepted and customary Transportation Engineering practices and requirements, including OSHA requirements and failed to have its crane operator, Mr. McArthur, exercise the degree of care ordinarily employed by remote crane operators under the same or similar

5

conditions and like surrounding circumstances. This breach[] of the standard of care described herein caused Mr. Ball to lose his fingers.

50. It is well established in the [crane operating manual], OSHA, and engineering literature that teetering of a 20-ton container on the top of a [twist lock] and signaling the driver to lock in the [twist lock] by hand is not within the industry standard of care and this action was grossly negligent and well below the industry standard of care.

51. The reasons that Mr. McArthur landed the container askew (teetering) on the chassis was not because one or more of the [twist locks] were closed. As stated, previously, they were at the time of the loading of the container in the open position. The reason that Mr. McArthur landed the container poorly on the chassis is simply because he failed to correctly position the container in the first place.

52. It is the crane operator's responsibility to position a container properly onto the container chassis. If the crane operator does not position the container properly onto the container chassis, it is the crane operator's responsibility to raise the container and to place it again, but this time in the proper position.

53. [W]hen a remote crane operator suspects a container is not properly seated onto the container chassis, the industry standard of care demands *both* the resetting of the container *and* ensuring that the container is properly seated pursuant to the [crane operating manual] *and* at the same

time to warn the chassis driver via the crane's loud speaker not to attempt to lock the container in by hand.

54. It is below the industry standard of care and it is never appropriate to, as in this case to leave a 20-ton container to teeter on the top of a [twist lock] and signal to the chassis driver to lock the container in by hand.

55. [I]s [sic] the reason for this procedure is to ensure when the container is left to teeter perilously and not properly placed flush with the chassis and the [twist locks], the risk of the 20-ton container shifting and crushing the hand of the chassis driver or worse is needlessly endangering Mr. Ball life [sic].

56. The failure of the crane operator to follow the [crane operating manual] was a deviation from the industry standard of care, and the principal causation for Mr. Ball's loss of his fingers.

57. [CSX] failed to comply with OSHA's General Duty Clause and provide draymen such as Mr. Ball with a workplace that is free from recognized hazards that are likely to cause serious physical harm. According to the General Duty Clause the employers have the responsibility to identify and correct any hazards that may harm employees, visitors, customers, or others. In this case the workplace is an intermodal facility and the draymen are invited workers that are entitled to full protection from injury in the workplace. As noted in "DRAYMEN CRITICAL RULES January 2023" (Copy of Rules in

place at the time of the incident), the use of a hammer by Draymen was a known hazard that was not addressed.

58. [CSX] also deviated from the standard of care in the following respects:

58.1 Failed to perform proper intermodal yard supervision, observe the unsafe operating practices (safety audits etc.) and enforce terminal operating rules.

58.2 Failed to properly control and supervise the loading of a container onto the intermodal chassis.

58.3 Failed to ensure that each loading site had written standard operating procedures for safely loading of containers.

58.4 Failed to properly inspect, identify and maintain equipment readiness according to Equipment Reliability Program (ERP).

58.5 Failed to ensure that loading, pre-departure inspections of all intermodal equipment is conducted by personnel other than the loading crew, such as loading crew supervisors or lead person. The inspection should:

58.5.1. include a positive inspection and confirmation of intermodal container-to-trailer chassis locks.

58.5.2. include a visual inspection for the proper positioning and balance of all containers on the intermodal chassis. [A]ll work performed by personnel trained to perform load securement inspections and thoroughly familiar with all types of securement systems.

58.5.3. [E]nsure a positive check of [twist locks] to guarantee proper chassis container securement.

58.5.4. All work performed should be recorded and signed by the reained [sic] individual performing the inspection.

58.6. Failed to enforce the use of personal protective equipment as required by OSHA at the intermodal termina [sic] facility, including proper hand protection.

58.7. Failed to perform formal safety audits focused on both the unsafe conditions and unsafe work practices at the intermodal facility.

58.8. Failed to prevent the common practice of using a hammer to correct a chassis loading defect.

58.9. Failed to comply with the ANSI standard[s] for the use of safety signs, colors, and symbols intended to prevent personal injury by visually alerting yard workers to potential hazards.

58.10. Failed to have sufficient warning signs at the location of this incident warning drayment of the hazards of adjusting the container and chassis at this intermodal facility.

59. Furthermore, Mr. McArthur violated the following rules from the CSX Intermodal Terminals Safety Rulebook 2021, CSXITDocProd.3-4-2020.000069-000104:

59.1 Equipment Operation Safety Rule IM-EQP.28. "Operators must ensure chassis front push-pins are retracted and rear [twist locks] are in the unlocked position when mounting or dismounting container from a chassis."

59.2. IM-EQP .48. "When working with a ground person, discontinue all activity immediately if visual or radio contact is lost or hand signals are not clearly understood. Resumption of work may occur only after communication (visual or radio contact) is reestablished and or hand signals are understood by all parties."

60. The aforementioned breaches of the industry standard of care and rule violations described herein directly contributed to Mr. Ball losing his fingers.

61. To a reasonable degree of engineering certainty, the negligence of [CSX] and Mr. John McArthur was the primary causation for the loss of Tyrik Ball's fingers.

62. To a reasonable degree of engineering certainty, had [CSX] and Mr. McArthur not deviated from the standard of care as described above, Tyrik Ball would not have had his fingers crushed-flat and amputated.

63. Mr. Ball did not breach the standard of care of a reasonable drayman.

The Defendants filed two motions to strike paragraphs 47-63 from Berkowitz's affidavit, arguing in part that those paragraphs did not contain any scientific or specialized knowledge that would aid a jury in understanding the issues. The trial court agreed and granted the motion to strike, determining that the matters in paragraphs 47-63 of Berkowitz's affidavit were not beyond the understanding of the average juror.

The trial court also granted the Defendants' motions for summary judgment.[4] The court first concluded that summary judgment was proper to USS on Ball's claim that USS was negligent in loading the chassis because it did not own or operate the facility where the accident occurred.[5] The court further concluded that, based on the

_____

[4] The trial court did not hold a hearing on the motion because neither party timely requested oral argument.

[5] Ball conceded that summary judgment was proper on his product liability claim.

11

video of the incident and Ball's deposition testimony, Ball's actions of placing his hand in the gap and not keeping watch of the container were the sole proximate cause of his injuries. The court also concluded that, even if there was some degree of negligence on the part of the Defendants, Ball could have avoided the consequences, and thus his negligence exceeded any supposed negligence of the Defendants. This appeal followed.

1. Ball argues that the trial court erred by striking paragraphs 47-63 of Berkowitz's affidavit because those paragraphs pertained to matters that were beyond the understanding of the average juror.[6] We conclude that the trial court did not abuse its discretion in this regard.

"[I]t is the role of the trial court to act as a gatekeeper of expert testimony[,]" and "[w]e give broad deference to the trial court to fulfill this gatekeeper role." *Emory Univ. v. Willcox*, 355 Ga. App. 542, 543-544 (1) (844 SE2d 889) (2020). Thus, "[w]hether expert testimony ought to be admitted under OCGA § 24-7-702 is a question committed to the sound discretion of the trial court. We will not disturb the

---

[6] We address Ball's enumerations of error in a different order than he presented in his appellate brief. See *Cleveland v. Sentinel Ins. Co.*, 354 Ga. App. 795, 797 (1) (a) (840 SE2d 738) (2020) (reviewing trial court's exclusion of expert testimony before determining whether summary judgment was proper).

trial court's determination absent a manifest abuse of discretion." (Citation omitted). Id. at 544 (1).

OCGA § 24-7-702 ("Rule 702") concerns the admissibility of opinion testimony by expert witnesses in civil and criminal cases. *Johnson v. Terminal Investment Corp.*, 374 Ga. App. 629, 632 (1) & n.4 (913 SE2d 14) (2025). Under this statute, the testimony of a qualified expert is admissible if:

> (1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (2) The testimony is based upon sufficient facts or data;
>
> (3) The testimony is the product of reliable principles and methods; and
>
> (4) The expert has reliably applied the principles and methods to the facts of the case.

OCGA § 24-7-702 (b). In determining the admissibility of expert testimony under Rule 702, a trial court must conduct a three-part inquiry where the court considers whether:

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his

13

conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[7]; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

(Citation omitted.) *Johnson*, supra, 374 Ga. App. at 633 (1). In explaining the third prong of the inquiry, the Eleventh Circuit has explained that "expert testimony is admissible if it concerns matters that are beyond the understanding of the average lay person." *United States v. Frazier*, 387 F3d 1244, 1262 (III) (A) (11th Cir. 2004).[8] On the other hand, "[p]roffered expert testimony generally will not help the trier of fact when it offers nothing more than what lawyers for the parties can argue in closing arguments." Id. at 1262-1263 (III) (A).

In light of the trial court's gatekeeper role and the deference that is given to trial courts to perform its role, we cannot say that the trial court abused its discretion by excluding paragraphs 47-63 of Berkowitz's affidavit. Berkowitz averred that, in his

---

[7] 509 U. S. 579 (113 SCt 2786, 125 LE2d 469) (1993).

[8] "Because Georgia's Rule 702 is modeled after Rule 702 of the Federal Rules of Evidence, we look to the decisions of federal appellate courts, especially the United States Supreme Court and the Eleventh Circuit for guidance." (Citation and punctuation omitted.) *Johnson*, supra, 374 Ga. App. at 633 (1) n.10.

opinion, (1) the twist locks were open at the time the container was lowered onto the chassis; (2) CSX failed to follow the crane operator manual and breached the standard of care; (3) the container teetered on the chassis because one of the twist locks were closed; (4) it was the crane operator's responsibility to position the container properly onto the chassis; (5) a crane operator is responsible for resetting the container onto the chassis if he or she suspects that the container is not properly seated on the chassis; (6) the crane operator failed to follow the crane operator manual; (7) CSX failed to follow OSHA's procedures; (8) CSX failed to control and supervise the loading of the container onto the chassis and to inspect the equipment; (9) CSX failed to have warning signs; (10) McArthur violated CSX's policies; and (11) the breaches of the standard of care caused Ball's injuries. There is nothing in these averments that contain any specialized or technical knowledge that would assist a jury in deciding the issues in the case. Instead, the averments involve matters in which a juror could take the same elements from the record upon which Berkowitz relied and make an equally intelligent judgment of their own as to whether the Defendants breached the standard of care and caused Ball's injuries. Consequently, we conclude that the trial court did not abuse its discretion by excluding these portions of the affidavit. See *Purcell v.*

15

*Kelley*, 286 Ga. App. 117, 118-119 (1) (648 SE2d 454) (2007) (officer's expert testimony that, based on witness statements, a traffic light was red at the time of the collision was improperly admitted at trial because the testimony was not beyond the knowledge of the jurors, and the jurors heard the same testimony relied upon by the officer and were therefore able to draw their own conclusion about the traffic light). Compare *Robinson v. State*, 309 Ga. 729, 734-735 (3) (848 SE2d 441) (2020) (trial court did not abuse its discretion by admitting expert testimony concerning a bite mark because the jurors would not have been able to make an intelligent judgment of their own about the bite mark, "including the force necessary for an adult to leave a bite mark on a child and whether such marks were indicia of an intentional act.").

2. Next, Ball argues that the grant of summary judgment to the Defendants was improper because genuine issues of material fact remain as to whether his actions were the proximate cause of his injuries. We disagree.

"To state a cause of action for negligence, a plaintiff must establish the following essential elements: (1) a legal duty; (2) a breach of this duty; (3) an injury; and (4) a causal connection between the breach and the injury." (Citation omitted.) *Chandler*, supra, 370 Ga. App. at 49 (a). "To establish a negligent training claim, a

16

plaintiff must demonstrate that inadequate training caused a reasonably foreseeable injury." (Citation omitted.) *ABM Aviation v. Prince*, 366 Ga. App. 592, 598 (2) (b) (884 SE2d 8) (2023). As to the causation element for negligence claims, "the plaintiff must prove that the defendant's negligence was both the cause-in-fact and the proximate cause of the injury." (Punctuation omitted.) *Blondell v. Courtney Station 300 LLC*, 362 Ga. App. 1, 4 (1) (865 SE2d 589) (2021). To establish proximate cause, "a plaintiff must show a legally attributable causal connection between the defendant's conduct and the alleged injury." (Citation and punctuation omitted.) *Stadterman v. Southwood Realty Co.*, 361 Ga. App. 613, 615 (1) (865 SE2d 231) (2021). The relevant question is whether, assuming the defendant breached a duty of care, "the kind of harm that occurred was a foreseeable result, or a probable or natural consequence of[] that breach." (Citation and punctuation omitted.) *Pappas Restaurant, Inc. v. Welch*, 371 Ga. App. 614, 617 (1) (c) (901 SE2d 751) (2024).

Importantly, "it is a well-settled principle of negligence law that the occurrence of an unfortunate event is not sufficient to authorize an inference of negligence." (Citation omitted.) *Stadterman*, 361 Ga. App. at 615 (1). "And, a general rule of proximate cause is that a wrongdoer is not responsible for a consequence which is

17

merely possible, according to occasional experience, but only for a consequence which is probable, according to ordinary and usual experience." (Citation omitted.) *Welch*, supra, 371 Ga. App. at 618 (1) (c). Thus,

> no matter how negligent a party may be, if his act stands in no causal relation to the injury, it is not actionable. Indeed, the plaintiff must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was a cause in fact of the result. Significantly, a mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced, it becomes the duty of the court to grant summary judgment for the defendant.

(Citations and punctuation omitted.) Id. See also *Edwards v. Campbell*, 338 Ga. App. 876, 882 (2) (792 SE2d 142) (2016) ("[A]lthough the question of proximate cause is usually submitted to the jury as a question of fact, it may be decided as a matter of law when the evidence shows clearly and palpably that the jury could reasonably draw but one conclusion, that the defendant's acts were not the proximate cause of the injury.") (citation and punctuation omitted). Moreover,

> [a] prior and remote cause cannot be made the basis of an action if such remote cause did nothing more than furnish the condition, or give rise to the occasion by which the injury was made possible, if there intervened

18

between such prior or remote cause and the injury a distinct, successive, unrelated, efficient cause of the injury. If no danger existed in the condition except because of the independent cause, such condition was not the proximate cause.

(Citation and punctuation omitted.) *Sweeney v. Branigar Properties Inc.*, 277 Ga. App. 677, 678 (627 SE2d 409) (2006).

Here, in light of the foregoing principles, we conclude that the trial court did not err by determining that no genuine issues of material fact remained as to whether the loading of the container onto the chassis proximately caused Ball's injuries. The loading and placement of the container above the chassis did nothing more than furnish the condition that made it possible for Ball to place his hand between the container and the chassis. Ball's injuries were the result of him using a hammer to strike the twist lock, which caused the container to drop onto the chassis and crush his hand which he admitted should not have been placed between the container and the chassis. Therefore, even if the Defendants breached a duty of care in loading the container onto the chassis, the trial court did not err by concluding that Ball's actions were the sole proximate cause of his injuries. See *Johnson v. Rice*, 211 Ga. App. 687, 688 (440 SE2d 81) (1994) (defendant's actions of driving his car into a grocery store

was not the proximate cause of the plaintiff's injuries which she sustained while attempting to save goods from spoilage after the collision); *Jackson v. Real Property Svcs. Corp.*, 268 Ga. App. 675, 676 (602 SE2d 356) (2004) (inoperable vehicle that the landlord failed to remove from its property was not the proximate cause of the plaintiff's son's injuries where the child was injured after the child's friend pulled on the car's antenna and struck the child's eye).

Additionally, an affirmative defense to a negligence action is the doctrine of avoidable consequences, which is set out in OCGA § 51-11-7. That statute states in part: "[i]f the plaintiff by ordinary care could have avoided the consequences to himself caused by the defendant's negligence, he is not entitled to recover." Under this doctrine, we have explained that

> the plaintiff must exercise ordinary care for his own safety, and must by the same degree of care avoid the effect of the defendant's negligence after it becomes apparent to him or in the exercise of ordinary care he should have learned of it. The plaintiff must make use of all his senses in a reasonable measure amounting to ordinary care in discovering and avoiding those things that might cause hurt to him. The plaintiff's negligence in failing to avoid the consequences of the defendant's negligence is deemed the sole proximate cause of the injuries sustained

and, therefore, is a complete bar to recovery, unless the defendant willfully and wantonly inflicted the injuries.

(Citations and punctuation omitted.) *Chandler*, supra, 370 Ga. App. at 51 (b). "As with other affirmative defenses, the defendant has the burden of proving, either at trial or summary judgment, that the plaintiff by ordinary care could have avoided the consequences to himself or herself caused by the defendant's negligence." (Citation omitted.) Id. "Although the issue of whether the plaintiff exercised due diligence for [his] own safety is ordinarily reserved for the jury, it may be summarily adjudicated where the plaintiff's knowledge of the risk is clear and palpable." (Citation and punctuation omitted.) *Weston v. Dun Transp.* 304 Ga. App. 84, 88 (1) (695 SE2d 279) (2010).

In this case, Ball could have avoided his injuries by not placing his hand under the container while attempting to close the twist lock. Indeed, had Ball used "all of his senses," he would have discovered that he had placed his hand in a gap between a 43,000-pound container and the chassis while attempting to secure the container to the chassis. But Ball admitted that at the time of the accident, his focus was on opening the twist lock with the hammer and that he was not aware that he had placed

his hand in the gap. Moreover, Ball, who had worked out of the Fairburn facility "over 100 times," admitted that his actions were not reasonable. Accordingly, the trial court also correctly determined that even if the Defendants were negligent in loading the container, Ball could have avoided the consequences, and thus his actions were the sole proximate cause of his injuries. See *Weston*, supra, 304 Ga. App. at 88-89 (1) (trial court did not err by granting summary judgment based on the avoidable consequences doctrine in wrongful death action stemming from a traffic crash because the decedent had negotiated the location of the crash "multiple times over several years," she understood that she had to yield to traffic, and she knew heavy vehicles traveled on that roadway but she elected to pull into the roadway in front of a tractor-trailer which struck her car).

Nevertheless, Ball asserts a number of arguments to support his claim that the trial court's order should be reversed, but none of the claims have merit. Ball first argues that reversal is required because the trial court relied solely on the video of the accident to reach its decision. But we find no support for this claim. In the order, the trial court cited Ball's deposition testimony and McArthur's testimony in addition to the video in determining that no genuine issues of material fact remained as to

proximate cause. And although Ball argues that material fact issues exist because, from his perspective at the time of the accident, he did not see a gap between the container and the chassis, we disagree. We have reviewed the video of the accident and observed a horizontal gap between the container and the chassis on the rear passenger side, and we note that other vehicles can be observed through the gap traveling in the opposite direction of his truck's position. Thus, Ball's subjective belief that there was no gap between the container and the chassis does not create an issue of fact as to whether a gap existed since the video clearly shows the gap, and it also shows that Ball placed his hand in the gap before the container fell onto the chassis and crushed his hand.[9] See *Smith v. Wal-Mart Stores East, LP*, 330 Ga. App. 340, 348 (2) (b) (ii) (765 SE2d 518) (2014) ("[W]here opposing parties tell two different stories, one of which is blatantly contradicted by a videotape of the incident, a court should not adopt that version of

---

[9] Additionally, Ball's reliance on McArthur's deposition testimony also does not create any material fact issues. We have not located McArthur's deposition in the record on appeal, and we note that Ball does not refute CSX's assertion that the deposition was never filed below in the trial court and was not included in the record on appeal. Consequently, we cannot consider Ball's arguments regarding McArthur's testimony in this appeal. See *Bennett v. Quick*, 305 Ga. App. 415, 417 (699 SE2d 539) ("We cannot consider factual assertions in briefs that are not supported by the record.") (citation omitted).

the facts for purposes of ruling on a motion for summary judgment.") (citation and punctuation omitted).

Moreover, we reject Ball's claim that summary judgment was improper based on USS' alleged violations of the Federal Motor Carrier Safety Regulations. Notably, Ball did not assert a negligence per se claim against the Defendants in his complaint. But even if Ball had asserted a negligence per se claim, he would still not be entitled to a reversal of the trial court's summary judgment order.

> Generally speaking, negligence per se arises when a statute or ordinance is violated. And the violation of certain mandatory regulations may also amount to negligence per se if the regulations impose a legal duty. But negligence per se is not liability per se. So, even if negligence per se is shown, the plaintiff must still prove proximate cause and actual damage in order to recover.

(Citations and punctuation omitted.) *Kearney v. Oppenheimer & Co., Inc.*, 375 Ga. App. 254, 266 (2) (915 SE2d 709) (2025). For the reasons stated above, even if the Defendants were negligent in loading the container onto the chassis, their actions were not the proximate cause of Ball's injuries. Thus, even if Ball had asserted a negligence per se claim, he would not have been entitled to a reversal of the trial court's order.

See Id. (plaintiffs' negligence per se claim failed because the defendant's actions were not the proximate cause of their injuries).[10]

In sum, although we are mindful of the unfortunate circumstances of this case, for the foregoing reasons, we affirm the trial court's order excluding portions of the expert testimony and granting the Defendants' motion for summary judgment.

*Judgment affirmed. Rickman, P. J., and Gobeil, J., concur.*

---

[10] And to the extent that Ball argues that the Defendants were required to present expert testimony in support of their claim that his actions were the sole proximate cause of his injuries, this claim also fails. Ball only asserted claims for ordinary negligence, and it is well settled that "expert evidence is not required in the mine run of simple negligence cases[.]" (Citation omitted.) *Zephaniah v. Ga. Clinic, P.C.*, 368 Ga. App. 325, 330 (3) (890 SE2d 86) (2023). Here, it is not beyond the understanding of a lay jury that Ball's action of placing his hand underneath a 43,000-pound container proximately caused his hand to be crushed, and thus expert testimony was not required. See *Gardner v. Clark*, 339 Ga. App. 62, 65 (793 SE2d 439) (2016) (expert testimony was not required for a lay jury to determine that a fire proximately caused the decedent's death who was otherwise healthy and was found "charring" and "burning" on her lower extremities).